**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| GRETCHEN VON BOESELAGER, | CASE NO. 1:25-CV-01018-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Gretchen Von Boeselager challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of May 22, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #7). For the reasons below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Von Boeselager applied for DIB in April 2022, alleging she became disabled in March 2021. (Tr. 186). After her claim was denied initially and on reconsideration, Ms. Von Boeselager requested a hearing before an Administrative Law Judge. (Tr. 74-85, 87-96, 112-13). In April 2024, Ms. Von Boeselager (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 52-72). In May 2024, the ALJ determined Ms. Von Boeselager was not disabled. (Tr. 15-47). The Appeals Council denied her request for review of the ALJ's decision, so that decision is the

1

Commissioner's final decision. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Von Boeselager timely filed this action. (ECF #1).

FACTUAL BACKGROUND

I.      Personal and Vocational Evidence

Ms. Von Boeselager was 37 years old on her alleged onset date and 40 years old at the administrative hearing. (*See* Tr. 74). She completed her bachelor's degree in English and has past relevant work experience as a child development specialist and a teacher for learning-disabled students. (Tr. 41, 53).

II.     Medical Evidence

Ms. Von Boeselager has a history of systemic lupus erythematosus (SLE), dysautonomia, irritable bowel disease (IBD), fibromyalgia, hypothyroidism, celiac disease and colitis, attention deficit hyperactivity disorder (ADHD), depression, and anxiety.[1]

In June 2020, Ms. Von Boeselager was psychiatrically evaluated for ADHD symptoms including inattention, distractibility, and forgetfulness. (Tr. 358). There, she reported a stable

---

[1]     SLE is an autoimmune disease that causes the immune system to mistakenly attack health tissue and can affect the skin, joints, kidneys, and brain, among other organs. Common symptoms include chest pain with deep breathing, fatigue, general discomfort, weight loss, hair loss, sensitivity to sunlight, and rashes. If the brain is affected, other signs and symptoms may include headaches, weakness, numbness, tingling, and memory changes. SLE affecting the digestive tract can cause abdominal pain, nausea, and vomiting. *Systemic lupus erythematosus, MedlinePlus,* http://medlineplus.gov/ency/article/000435.htm (last accessed Apr. 8, 2026).
Dysautonomia is a nervous system disorder that disrupts the autonomic nervous system, the self-governing body processes such as blood pressure, body temperature, breathing, digestion, heart rate, and sweating. Symptoms include fainting (especially when standing), nausea and vomiting, brain fog, tachycardia, changes in bowel movements, fatigue, chest pain, sleeping problems, dizziness, migraines and headaches, and swings in body and skin temperature. Conditions that cause or contribute to the disorder include lupus and orthostatic hypertension, among others. *Dysautonomia, Cleveland Clinic,* http://my.clevelandclinic.org/health/diseases/6004-dysautonomia (last accessed Apr. 8, 2026).

mood and sleeping well but feeling groggy and irritable in the mornings, irritability and difficulty concentrating due to worry, and intrusive thoughts and nightmares. (Tr. 358-59). She endorsed making careless mistakes and being disorganized, easily distracted, and forgetful. (Tr. 359). The examiner noted her attention and concentration were normal during the interview. (Tr. 362). She was prescribed atomoxetine.[2] (Tr. 363). At a follow-up, she reported atomoxetine was mildly effective in helping her focus. (Tr. 353). The provider increased her dose. (Tr. 357).

In August 2020, Ms. Von Boeselager sought treatment with a neurologist for progressively worsening numbness, burning, and loss of feeling in her hands and feet. (Tr. 326). She endorsed numbness as the primary symptom and reported gabapentin, nortriptyline, and medical marijuana helped relieve the burning sensations. (Tr. 327). She also reported weakness that caused her to drop objects, dry skin and mouth, decreased sweating and hair growth in the distal limbs, occasional nausea and vomiting, alternating diarrhea and constipation, decreased appetite, and dizziness. (Tr. 327-28). Her neurologist performed a limited physical examination over the telehealth session, noting Ms. Von Boeselager had more limited abduction in the fingers on her right hand than her left. (Tr. 329).

In November 2020, Ms. Von Boeselager met with a functional medicine doctor and reported a sore and tender abdomen with bloating and diarrhea, difficulty concentrating, memory issues, dizziness, and lightheadedness. (Tr. 514-15). That month, her mental health provider increased her dose of atomoxetine. (Tr. 352).

---

[2]     Atomoxetine is a selective norepinephrine reuptake inhibitor used to increase the ability to pay attention and decrease impulsiveness and hyperactivity. *Atomoxetine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a603013.html (last accessed Apr. 8, 2026).

Since 2015, Ms. Von Boeselager has sought treatment at the Comprehensive Pain Center for fibromyalgia, joint pain, migraines, and lupus. (*See* Tr. 428). In December 2020, she returned to the Center reporting more migraines. (Tr. 429). She also reported feeling less scattered and irritable, improving in memory and concentration with atomoxetine, and working from home. (*Id.*). She rated her current pain at three of ten on a ten-point scale. (*Id.*). The provider increased gabapentin and continued nortriptyline.[3] (Tr. 430). That month, she presented at a follow-up psychiatric telehealth session where she reported significant improvement in attention and focus with the increased dose of atomoxetine, but she continued to struggle with distractibility and time management. (Tr. 343). Her psychiatrist increased atomoxetine. (Tr. 346).

In January 2021, Ms. Von Boeselager met with rheumatologist Van Warren, M.D., and reported occasional joint pain with mild stiffness in the morning lasting less than twenty minutes. (Tr. 571). On examination, she had tenderness to palpation in the joints of her fingers and a congenital deformity in the last finger of her right hand but could make a full fist with good strength. (Tr. 574). She had full range of motion in her shoulders, wrists, elbows, and knees and her rheumatologist found no active synovitis in any joints. (*Id.*). Dr. Warren continued her prescriptions for hydroxychloroquine and azathioprine.[4] (Tr. 571). That same month, Ms. Von

---

[3]    Gabapentin is an anticonvulsant sometimes used to treat numbness and tingling due to nerve damage. *Gabapentin, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a694007.html (last accessed Apr. 8, 2026). Nortriptyline is a tricyclic antidepressant that is used to treat depression and nerve pain. *Nortriptyline, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682620.html (last accessed Apr. 8, 2026).

[4]    Hydroxychloroquine is used to treat lupus by decreasing immune system activity. *Hydroxychloroquine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601240.html (last accessed Apr. 8, 2026). Azathioprine is an immunosuppressant used to decrease joint damage in people with lupus. *Treating Lupus with Immunosuppressive Medications, John Hopkins Lupus Center,* http://www.hopkinslupus.org/lupus-treatment/lupus-medications/immunosuppressive-medications/ (last accessed Apr. 8, 2026).

Boeselager met with her pain management physician and reported the increased dose of gabapentin helped to relieve her diffuse pain and allowed her to return to weightlifting. (Tr. 426).

In early March 2021, Ms. Von Boeselager presented at the emergency department with a sudden onset of severe epigastric abdominal pain with vomiting and diarrhea. (Tr. 390). She received Zofran, Pepcid, and intravenous fluids without relief. (*Id.*). After a dose of morphine, she felt better and was discharged in stable condition. (Tr. 391). She returned to the emergency department in mid-March after two days of nausea, vomiting, chills, and sweats. (Tr. 364). She had mild, diffuse abdominal tenderness and increased pain after eating. (Tr. 364, 370). A CT scan of her abdomen and pelvis showed mild diffuse wall thickening in her colon "suspicious for nonspecific infection or inflammatory colitis." (Tr. 369). She received dicyclomine for pain and prophylactic antibiotics.[5] (Tr. 370). She was diagnosed with colitis and discharged after three days. (Tr. 387). One week after discharge, Ms. Von Boeselager resigned from her job to reduce stress. (*See* Tr. 567). Also in March, Ms. Von Boeselager followed up with her psychiatrist and reported atomoxetine helps but wears off by late afternoon or early evening. (Tr. 339). She also described gastrointestinal issues, poor appetite, low-level anxiety about work, stable mood, and feeling less physically fatigued. (*Id.*).

In April 2021, Ms. Von Boeselager met with a gastroenterologist for intermittent diarrhea and nausea since she had colitis in March. (Tr. 636-37). Her gastroenterologist suspected post-infectious IBD and ordered celiac blood work. (Tr. 636).

---

[5]     Dicyclomine is an anticholinergic used to treat symptoms of irritable bowel syndrome by relieving muscle spasms in the gastrointestinal tract. *Dicyclomine, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a684007.html (last accessed Apr. 8, 2026).

Ms. Von Boeselager returned to Dr. Warren in May 2021 and reported hip pain and gastrointestinal pain with intermittent diarrhea and unintentional weight loss. (Tr. 566-67). Dr. Warren noted mild epigastric tenderness and a reducible swan-neck deformity at the third digit of her right hand with triggering at the middle joint of the finger (PIP joint). (Tr. 567). Dr. Warren ordered her to hold azathioprine for three days to see if that improved her abdominal discomfort. (*Id.*).

During a June 2021 telehealth pain management appointment, Ms. Von Boeselager rated her current pain at two-to-three on a ten-point scale. (Tr. 424). Her medications were refilled. (Tr. 425).

In September 2021, Ms. Von Boeselager returned to Dr. Warren reporting thinning hair and abdominal discomfort. (Tr. 562). Dr. Warren noted that her "abdominal discomfort may be related to previous colitis" or side effects of hydroxychloroquine or azathioprine and directed her to reduce azathioprine for one week. (*Id.*).

During a November 2021 pain management appointment, Ms. Von Boeselager reported sleeping well and volunteering at an animal facility. (Tr. 422). The provider refilled her medications. (*Id.*).

In January 2022, Ms. Von Boeselager reported generalized musculoskeletal pain, heartburn, abdominal discomfort, and fatigue. (Tr. 558). She denied improvement after reducing azathioprine. (*Id.*). Dr. Warren continued her prescriptions for hydroxychloroquine and

azathioprine, prescribed pantoprazole and famotidine for gastroesophageal reflux disease (GERD), and directed her to meet with her gastroenterologist.[6] (*Id.*).

In April 2022, during a telehealth pain management appointment, Ms. Von Boeselager endorsed increased exhaustion and worsened symptoms of ADHD. (Tr. 419). She stopped volunteering after she hurt her finger. (*Id.*). Her provider refilled her prescriptions for gabapentin and nortriptyline. (Tr. 420).

At her next rheumatology appointment in June 2022, Ms. Von Boeselager reported brain fog, concentration issues, and discomfort in her fingers and feet. (Tr. 553). She was not taking any medication for ADHD and recently stopped taking vitamin D. (*Id.*). On physical examination, Dr. Warren noted good range of motion in all extremities and a radial deviation of the joint at the tip (DIP joint) of her right-hand pinky finger. (*Id.*). Dr. Warren recommended that she resume taking vitamin D. (*Id.*).

In September 2022, Ms. Von Boeselager reported intermittent left-sided abdominal pain during her gastroenterology appointment. (Tr. 627). Dr. Abbass prescribed dicyclomine for stomach pain and rifaximin for IBD and visceral hypersensitivity.[7] (*Id.*).

---

[6] Pantoprazole is used to treat damage from GERD by decreasing the amount of acid made in the stomach. *Pantoprazole, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601246.html (last accessed Apr. 8, 2026). Famotidine is used to treat GERD by decreasing the amount of acid made in the stomach. *Famotidine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a687011.html (last accessed Apr. 8, 2026).

[7] Rifaximin is an antibiotic prescribed to treat IBD by stopping the growth of bacteria that causes diarrhea. *Rifaximin, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a604027.html (last accessed Apr. 8, 2026).

During a telehealth pain management appointment in October 2022, Ms. Von Boeselager reported her current pain as one to two on a ten-point scale. (Tr. 802). She had returned to volunteering once a week and described increased functioning. (Tr. 802-03).

In December 2022, Ms. Von Boeselager reported myalgias, rashes, canker sores, and aching in her hands and ankles after she stopped taking azathioprine for five days. (Tr. 836). Dr. Warren recommended she stop azathioprine and observe for exacerbation of lupus-related symptoms. (*Id.*).

Ms. Von Boeselager's symptoms exacerbated after stopping azathioprine. In February 2023, she reported aching pain in her hips, hands, and left shoulder for eight weeks; mild swelling in her hands; tingling and a sensation of musculoskeletal weakness; transient rashes on her chest; and some abdominal discomfort. (Tr. 882). On physical examination, Dr. Warren noted mild abdominal tenderness and radial deviations of the joint at the tip of the last digit on both hands. (*Id.*). The examination was otherwise normal with preserved range of motion, good muscle strength, and normal gait. (*Id.*). Dr. Warren prescribed weekly injections of Benlysta.[8] (*Id.*).

In March 2023, Ms. Von Boeselager began taking mycophenolate for her abdominal discomfort.[9] (*See* Tr. 1074).

In October 2023, Ms. Von Boeselager reported a left temporal headache; pain in her hands, feet, and hips; and significant abdominal discomfort, cramping, and pain. (Tr. 1075). She also reported intermittent migraines typically worse than her current headache. (Tr. 1076). Her

---

[8]     Benlysta is the brand name for belimumab, an injection used to treat lupus. *Belimumab Injection, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a611027.html (last accessed Apr. 8, 2026).

[9]     Mycophenolate is an immunosuppressive agent sometimes used to treat conditions in which the body attacks the lining of the digestive tract. *Mycophenolate, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601081.html (last accessed Apr. 8, 2026).

physical examination was normal with preserved range of motion in the upper and lower extremity joint without joint effusion and no peripheral edema. (*Id.*). Dr. Warren determined her abdominal issues may be related to her medications and advised her to reduce and then discontinue mycophenolate and assess for improvement in abdominal symptoms and exacerbation of lupus symptoms. (Tr. 1076-77).

Ms. Von Boeselager sought orthopedic treatment for bilateral wrist pain in December 2023. (Tr. 1115). There, she reported difficulty with repetitive hand activities. (*Id.*). The orthopedist noted "some degree of hypermobility in all joints but excellent range of motion of the elbows, forearms, wrists, and hands"; tenderness to palpation over the bilateral distal radial ulnar joints (the joint between the wrist and forearm); and slight pain to palpation over the bilateral extensor carpi ulnaris tendons with visible partial dislocation of the tendons with resisted ulnar deviation. (Tr. 1119-20). The orthopedist diagnosed "bilateral wrist extensor carpi ulnaris tendon instability in the setting of lupus" and recommended occupational therapy. (Tr. 1120). The next day, Ms. Von Boeselager sought treatment for left hip and bilateral shoulder pain. (Tr. 1146). She was referred for physical therapy. (Tr. 1151).

Ms. Von Boeselager attended five occupational therapy sessions and reported overall reduced wrist pain when using a wrist brace during the exercises. (*See* Tr. 1209, 1199, 1189, 1182, 1172) (in chronological order). During her final visit, she reported greater difficulty and increased pain when she did not use the brace. (Tr. 1172). Even with the reported increase in pain, Ms. Von Boeselager demonstrated a 10-pound increase in grip strength without the brace. (Tr. 1173).

III.     **Opinion Evidence**

At the Social Security Administration's request, Ms. Von Boeselager was psychologically evaluated by Jorethia Chuck, Ph.D. (Tr. 932-37). There, she reported a history of ADHD symptoms including difficulty with focus, concentration, memory, and initiating and completing tasks. (Tr. 934). She used to take atomoxetine for ADHD but ceased it when she stopped working. (*Id.*). Dr. Chuck noted Ms. Von Boeselager did not appear to lose concentration during the interview and sat calmly "but was wringing her hands constantly." (Tr. 935). She diagnosed severe ADHD with inattentive presentation and opined the following:

> 1.     Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.
>
> Ms. Boeselager's cognitive functioning is estimated to be in the high average range based on presentation, education, and work history. Ms. Boeselager's presentation is consistent with ADHD, inattentive type which also impacts her ability to function on a daily basis. She would also have problems carrying out instructions.
>
> 2.     Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.
>
> Ms. Boeselager's ADHD would limit her ability to maintain attention and concentration. She has a lot of intrusive thoughts that would interfere with concentration. She would have difficulty carrying out tasks that require her to maintain persistence and pace.
>
> 3.     Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.
>
> Ms. Boeselager reported getting along with her coworkers, and she got along with her supervisor. She appeared to try to present with social conformity during the interview, she should be able to respond appropriately to supervision.
>
> 4.     Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.

10

> This claimant's mental ability to withstand the stresses and pressures associated with day-to-day work activities is assessed as having impairment. Given this claimant's mental state her adjustment levels are likely to deteriorate under the pressures of a normal work setting.

(Tr. 936-37).

In March 2023, state agency medical consultant Mehr Siddiqui, M.D., reviewed Ms. Boeselager's file and found she can lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk for six hours each in an eight-hour workday; never crawl or climb ladders, ropes, or scaffolds; frequently stoop, kneel, and crouch; and occasionally climb ramps and stairs; use the bilateral upper extremities occasionally for feeling and frequently for handling and fingering; must avoid even moderate exposure to vibrations and all exposure to hazards such as unprotected heights and dangerous machinery; and cannot drive commercially. (Tr. 81-82). Dr. Siddiqui supported these findings with evidence of Ms. Von Boeselager's cervical degenerative changes; history of nausea, vomiting, and dizziness from celiac disease; hand and foot numbness; migraines; and fatigue. (*Id.*).

Psychological consultant Ellen Rozenfeld, Psy.D., found Ms. Von Boeselager is moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods of time, completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and responding appropriately to changes in the work setting. (Tr. 83-84). Dr. Rozenfeld noted Ms. Von Boeselager's ADHD affects her ability to maintain attention and concentration and concluded she "can complete detailed tasks in a work setting without strict production quotas or fast-paced tasks," "maintain attention and concentration to complete 1- to 2-step tasks," and tolerate occasional workplace changes. (*Id.*).

11

In August 2023, new state agency medical and psychological consultants reconsidered Ms. Von Boeselager's application based on updated medical records and both consultants determined she did not give enough evidence to evaluate whether her conditions worsened since initial review. (Tr. 91-93).

## IV.     Testimonial Evidence

Ms. Von Boeselager completed three questionnaires concerning how her headaches, fatigue, and pain affect her ability to function. In the headache questionnaire, she explained her chronic migraines began when she was 16 years old and are triggered by certain foods, exposure to sunlight and heat, and lack of sleep. (Tr. 264). A typical migraine comes with pain at the front left side of her face, the back of her skull, forehead, temples, and eyes. (*Id.*). She has three-to-five migraines a week lasting three-to-six days that are accompanied by dizziness; sensitivity to light, noise, and movement; nausea; and vomiting. (Tr. 264-65). When she has a migraine, she must confine herself to a dark, quiet room and rest without moving for the duration of her migraine. (Tr. 265).

In the fatigue questionnaire, Ms. Von Boeselager endorsed full-body fatigue that makes breathing painful and limits her ability to care for herself. (Tr. 268). She typically wakes feeling exhausted and has energy "maybe once a week." (*Id.*). As a result, she showers less often, prepares easy meals to avoid standing too long, does not see friends or socialize, never has the energy to clean, and spends most of her days resting. (Tr. 269).

For the pain questionnaire, Ms. Von Boeselager identified pain in her upper and lower back, hips, knees, feet, wrists, right hand, neck, head, upper and lower gastrointestinal tract, and in her leg muscles. (Tr. 272). Sitting for too long, moving too much, and being exposed to heat and

12

sunlight can cause or increase her pain. (*Id.*). As a result, she struggles to take even short walks with the dogs, needs help to carry loads of laundry, and cannot run more than one errand a day. (Tr. 273). The pain distracts her from focusing on tasks. (*Id.*). To reduce pain, she avoids certain foods that trigger pain and inflammation, does yoga and mobility exercises, engages in physical therapy, and gets massages. (*Id.*). She uses gabapentin, nortriptyline, and medical marijuana for pain relief. (*Id.*).

At the administrative hearing, Ms. Von Boeselager testified she cannot work due to multiple sources of chronic pain. (Tr. 56). She gets intense intestinal cramping that wakes her from sleep most nights. (*Id.*). She has daily gastrointestinal pain that lasts between 45-to-90 minutes on average and has nausea and vomiting once a week. (*Id.*). She has weekly back, joint, and muscle pain. (*Id.*). About once or twice a week, she has deep muscular leg pain that makes it difficult to walk, stand, or sit in one position for more than five to ten minutes. (*Id.*). She has back and hip pain lasting two to eight hours most days of the week. (Tr. 57). As a result, she must shift positions after ten minutes and she uses heating pads, ice, and stretching exercises to alleviate the pain. (*Id.*). She described wrist and hand pain with use, especially when cooking, writing, typing, and gripping objects. (Tr. 58). She has migraines three-to-five days a week and explained she must sit in a dark, quiet room for relief. (*Id.*).

Ms. Von Boeselager also has lupus with associated brain fog, nausea, vomiting, exhaustion, disorientation, and pain. (Tr. 60). When exposed to sunlight, she may break into hives or rashes. (*Id.*). Repetitive movements cause pain and inflammation in her joints and heat exposure may trigger brain fog. (*Id.*). She lives by routine and struggles to incorporate new tasks or habits. (Tr. 61). She is easily distracted, so, for instance, she may start cooking but then become preoccupied

with something on her phone and forget she is cooking altogether or may leave the refrigerator door open. (*Id.*). She struggles to remember directions and stay on topic during conversation. (Tr. 62). She has dysautonomia and experiences sudden hot flashes with sweating, cold chills, and dizziness. (Tr. 58-59). The symptoms can last minutes or hours. (*Id.*). When hot, she removes clothing and uses ice to cool down. (Tr. 58). When cold, she uses a heating pad and blankets to warm. (Tr. 59).

The combination of her impairments makes it difficult to complete chores like carrying loads of laundry, cooking, sweeping, and dusting. (Tr. 57). Climbing stairs causes intense pain and weakness. (*Id.*). And her pain generally limits her ability to play with her dogs and take them for walks. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

14

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Von Boeselager had not engaged in any substantial gainful activity since March 23, 2021, the alleged onset date. (Tr. 20). At Step Two, the ALJ identified the following severe impairments: SLE, dysautonomia, IBD, fibromyalgia, ADHD, depressive disorder, and trauma- and stressor-related disorder. (*Id.*). At Step Three, the ALJ found Ms. Von Boeselager's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 22). At Step Four, the ALJ determined Ms. Von Boeselager's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, or crouch; never crawl; frequently handle and finger and occasionally feel bilaterally; must avoid concentrated exposure to extreme heat; must avoid even moderate exposure to vibration; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; can carry out simple and detailed, but not complex, instructions in a routine work setting with few changes; and can respond

15

appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace.

(Tr. 29-30). The ALJ then found Ms. Von Boeselager could not perform her past relevant work with this RFC. (Tr. 41). At Step Five, the ALJ determined Ms. Von Boeselager can perform other work as a marker, officer helper, or photocopy machine operator and thus concluded she was not disabled. (Tr. 42).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

16

substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Von Boeselager raises three RFC-related issues for consideration. First, she contends the ALJ's determination that she can frequently use her upper extremities to perform tasks involving handling, fingering, and feeling is not supported by substantial evidence because the ALJ "failed to evaluate the records and minimized the significant deficits in [her] manipulative

17

capacity." (ECF #12 at PageID 1314-15). Second, she claims the ALJ did not incorporate the consultative psychological examiner's limitations into the RFC. (*Id.* at PageID 1318). Last, Ms. Von Boeselager argues the ALJ did not explain how the evidence supported his conclusion that she can perform light work. (*Id.* at PageID 1320).

The Commissioner responds that substantial evidence supports the limitations to frequent handling and fingering and occasional feeling, the ALJ properly considered the consultative psychological examiner's opinions, and substantial evidence supports the ALJ's finding that Ms. Von Boeselager can perform light work. (ECF #14 at PageID 1333, 1336, 1339).

**I.      Substantial evidence supports the ALJ's conclusion that claimant can frequently perform tasks requiring handling and fingering and occasionally perform tasks requiring feeling with her hands.**

Ms. Von Boeselager notes the ALJ acknowledged the evidence of her hand limitations but discounted them as inconsistent with the record and relied on isolated normal findings to undermine her reported symptoms. (ECF #12 at PageID 1316). She contends the ALJ's reliance on those normal findings amounts to "cherry-picking." (*Id.*).

A claimant's RFC represents the most a claimant can still do despite the physical and mental limitations resulting from the claimant's impairments. 20 C.F.R. § 404.1545(a). The ALJ alone determines a claimant's RFC. *Id.* § 404.1546(c). The RFC must be based on all relevant record evidence, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* § 404.1545(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical

evidence (*e.g.*, daily activities, observations)." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996). In short, the ALJ must connect the dots between the evidence and the conclusion.

The ALJ must assess the RFC "based on all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). The ALJ need not discuss every item of evidence in the record so long as the factual findings as a whole show that the ALJ implicitly considered the full record. *See Kornecky v. Comm'r of Soc. Sec.,* 167 F.App'x 496, 507-08 (6th Cir. 2006); *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F.App'x 426, 438 n.11 (6th Cir. 2014) ("[a]n ALJ 'can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'") (citation omitted). But the ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer,* 774 F.Supp.2d at 880 (citation omitted); *see also Minor v. Comm'r of Soc. Sec.,* 513 F.App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany Johnson v. Comm'r of Soc. Sec.,* 313 F.App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").

### A. The ALJ did not cherry-pick evidence from the record.

Ms. Von Boeselager has not shown the ALJ cherry-picked the record in assessing her RFC because, by her own admission, the ALJ did not ignore evidence relevant to her hand limitations. (ECF #12 at PageID 1316) ("the ALJ generally acknowledged Ms. Von Boeselager's hand limitations"). As district courts in this circuit have described, a fact the ALJ relies on is "truly cherry-picked" where the ALJ does not also "acknowledge evidence that potentially supports a finding of disability." *K.R.S. v. Bisignano,* No. 6:25-cv-92, 2026 WL 542348, at *4 (E.D. Ky. Feb. 26,

2026); *Beard v. Saul*, No. 1:18-cv-2500, 2019 WL 5684454, at *15 (N.D. Ohio Nov. 1, 2019). Ms. Von Boeselager has not identified evidence relevant to her hand limitations the ALJ did not consider that is required to substantiate her claim of the ALJ cherry-picking the record.

**B.      The ALJ properly assessed claimant's statements about her upper extremity pain.**

To the extent Ms. Von Boeselager contends the ALJ erred in discounting her reports of wrist, hand, and finger pain as inconsistent with "isolated normal findings," that argument also fails. As part of the RFC assessment, the ALJ must evaluate the claimant's statements about asserted symptoms in a two-step process. SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. *Id.*

In evaluating the limiting effects of a claimant's symptoms, the ALJ must consider all evidence in the record including: daily activities; the location, duration, and frequency of the alleged symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication; treatment other than medication; other efforts made to alleviate the symptoms; and other factors regarding the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(3). The ALJ determines the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2. An ALJ need not accept a claimant's

subjective complaints, *Jones*, 336 F.3d at 476, and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky*, 167 F.App'x at 508. In practice, this means the ALJ must make clear to the claimant and those reviewing the decision why the ALJ rejected probative evidence supporting a finding of disability. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (stating the ALJ's failure to explain more, aside from a conclusory analysis, "denotes a lack of substantial evidence," even if the record may justify the ALJ's conclusion).

The regulations require the ALJ's explanation be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10. The ALJ need not use any "magic words," so long as it is clear from the decision why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-cv-1617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-cv-98, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

In this case, the ALJ acknowledged Ms. Von Boeselager's hearing testimony, questionnaires, and complaints of pain, numbness, and loss of feeling in her hands and wrists (Tr. 326-30 (Aug. 2020)); aching hand pain (Tr. 882 (Feb. 2023)); hand pain (Tr. 1075 (Oct. 2023)); long-standing wrist pain and discomfort (Tr. 1115-20 (Dec. 2023)); and some remarkable findings such as radial deviation of the DIP joint of the fifth digit (Tr. 553 (June 2022); Tr. 881 (Feb. 2023)). (*See* Tr. 36). In his review of the medical evidence, the ALJ also noted radial deviation was

21

present in February 2023, but the physical examination that day was normal with good muscle strength, preserved range of motion, and no edema in the extremities. (Tr. 33). The ALJ also noted Ms. Von Boeselager's physical examination in October 2023 was also normal with preserved range of motion without joint effusion and "benign" extremities free of peripheral edema. (Tr. 33-34). And in December 2023, she reported her wrists "pop" with certain maneuvers, but she could not reproduce those symptoms at the appointment. (Tr. 1115). The ALJ found at that time, Ms. Von Boeselager had tenderness over her distal radial ulnar joints, slight pain to palpation over her extensor carpi ulnaris tendons, mild discomfort and joint hypermobility but "excellent" range of motion in the elbows, forearms, wrists, and hands without atrophy, normal sensation, and no instability in the intercarpal joints or the distal radial ulnar joints. (Tr. 34). Last, the ALJ considered her reports of pain with wrist-strengthening exercises alongside her documented improvement in wrist strength. (*Id.*). The ALJ then determined Ms. Von Boeselager's alleged functional limitations "are not entirely consistent with the claimant's reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions." (Tr. 37). To the ALJ, her daily functioning involved activities such as caring for and training dogs and volunteering once a week at a local kennel; dressing, shaving, toileting, and feeding herself without difficulty; and preparing meals and doing laundry and light cleaning. (Tr. 28). Considering that evidence, the ALJ concluded her wrist and hand pain caused a degree of limitation, but not to a disabling extent. (Tr. 37).

Discounting a claimant's statements somewhat is appropriate where the ALJ finds contradictions among the medical reports, testimony, and other evidence. *Walters,* 127 F.3d at 531. Here, the ALJ reasonably found Ms. Von Boeselager's allegation of disabling hand and wrist

pain inconsistent with normal examination findings, including normal strength, preserved range of motion in the joints, a lack of swelling, and no instability, made around the time of her reports of pain. The ALJ also found Ms. Von Boeselager's allegations inconsistent with her daily activities. The ALJ thus acted properly in considering these factors. *See* 20 C.F.R. §§ 404.1529(c)(2), (c)(3)(i) (ALJ must compare a claimant's testimony to objective medical evidence and her daily activities). And on this record, substantial evidence supports the ALJ's conclusion that Ms. Von Boeselager can frequently handle and finger and occasionally feel.

Again, Ms. Von Boeselager does not point to any relevant evidence or factor the ALJ did not consider. Rather, she argues the ALJ "minimized" the medical evidence and testimony regarding her hand impairments, or in other words, did not give enough weight to that evidence. (ECF #12 at PageID 1317). But a reviewing court cannot reweigh the evidence, make new determinations about the consistency of Ms. Von Boeselager's statements, and come to a different conclusion than the ALJ. Nor can a claimant show the ALJ erred in assessing her symptoms simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ. *Zingale v. Kijakazi,* No. 1:20-cv-2197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022). It bears repeating that even if substantial evidence supports a claimant's position, the Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. I decline to order remand on this basis.

## II.     Substantial evidence supports the ALJ's assessment of Dr. Chuck's medical opinion.

Ms. Von Boeselager next argues substantial evidence does not support the ALJ's assessment of Dr. Chuck's medical opinion. (ECF #12 at PageID 1318).

In assessing the claimant's RFC, the ALJ must review all medical opinions and prior administrative findings and explain how persuasive he finds them. *See* 20 C.F.R. § 404.1520c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R § 404.1520c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinion," the two most important factors. *See id.* § 404.1520c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation" and consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017).

The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability, and substantial evidence supports the discussion, then the court may not disturb the ALJ's findings. *Paradinovich v.*

24

*Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

Here, the ALJ concluded Dr. Chuck's opinion was vague because she did not describe the degree of Ms. Von Boeselager's functional limitations nor propose specific functional limitations to address the deficits her symptoms impose. (Tr. 40). The ALJ further determined Dr. Chuck's observations and test findings did not support significant deficit, but the ALJ could not assess the consistency of that opinion with the other evidence of record because the opinion was too vague for comparison. (Tr. 40).

**A.      The ALJ reasonably determined Dr. Chuck's opinion was vague.**

Ms. Von Boeselager first asserts Dr. Chuck's opinions are not vague. (ECF #12 at PageID 1318). The vagueness of a medical opinion is a valid factor on which the ALJ may rely in assessing supportability and consistency. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F.App'x 422, 434 (6th Cir. 2018) (affirming the ALJ's conclusion where discounted opinion was "quite vague"); *Katelyn M. v. Comm'r of Soc. Sec.*, No. 2:23-cv-12276, 2024 WL 4124675, at *10 (E.D. Mich. Sept. 9, 2024) ("[A]n ALJ can properly discount the weight of an expert opinion when it is too vague and does not support specific functional limitations."). District courts in the Sixth Circuit have determined a medical opinion is vague when it does not propose specific functional limitations. *See, e.g., Hollis v. Comm'r of Soc. Sec.*, No. 1:25-cv-867, 2026 WL 41113, at *11 (N.D. Ohio Jan. 7, 2026), *report and recommendation adopted*, 2026 WL 243912 (N.D. Ohio Jan. 29, 2026).

Dr. Chuck did not propose any specific functional limitations in Ms. Von Boeselager's abilities to understand, remember, or carry out instructions; maintain attention, concentration,

persistence and pace to perform tasks; or respond appropriately to work pressures. As such, the ALJ's assessment of the opinion as "vague" is reasonable.

### B. The ALJ did not cherry-pick evidence from the record.

Next, Ms. Von Boeselager asserts the ALJ again cherry-picked normal findings including good grooming, cooperation, the ability to maintain concentration, and high-average cognitive functioning by accepting those findings over abnormal findings of "a nervous mood, constant handwringing, poor memory and concentration, difficulty completing tasks, and functional decline caused by pain and fatigue." (ECF #12 at PageID 1318). She accuses the ALJ of substituting his own judgment for that of Dr. Chuck "by selectively determining which objective findings to credit." (*Id.*).

There are two problems with this argument. First, Ms. Von Boeselager has not pointed to relevant evidence the ALJ did not acknowledge. *See K.R.S.*, 2026 WL 542348, at *4 (a fact is "truly cherry-picked" when the ALJ does not acknowledge other relevant evidence that potentially supports finding a disability). For the same reason her cherry-picking argument did not prevail above, it too fails here.

Second, contrary to her claim, Dr. Chuck did not see Ms. Von Boeselager exhibit poor memory or concentration, difficulty completing tasks, or functional decline caused by pain and fatigue. Those are symptoms Ms. Von Boeselager *reported* during the evaluation; they are not clinical observations. (Tr. 934). Rather, Dr. Chuck noted she did not appear distracted by internal stimuli, did not lose concentration during sensorium and cognitive function testing, and showed intact remote and recent memory on testing. (Tr. 935). In terms of supportability, *i.e.,* the extent to which the opinion is supported by relevant objective medical evidence and the supporting

26

explanation, the ALJ emphasized the disconnect between Ms. Von Boeselager's presentation at the evaluation, her reported symptoms, and Dr. Chuck's opinion. As the ALJ correctly noted, Ms. Boeselager "wr[u]ng her hands constantly" but was not distracted by internal stimuli, did not lose concentration during testing, performed well on recent and remote memory testing, and displayed high-average cognitive functioning, incongruous with significant deficits. (Tr. 40, 935). Substantial evidence supports the ALJ's explanation that Dr. Chuck's findings do not support her opinions. Thus, I find the ALJ did not cherry-pick evidence on this issue.

> **C.     Ms. Van Boeselager has not identified a material inconsistency in the ALJ's assessment of the medical opinions.**

Last, Ms. Von Boeselager argues the ALJ's conclusion that Dr. Chuck's opinion is unpersuasive is inconsistent with her conclusion that state agency psychological evaluator Dr. Rozenfeld's opinion is persuasive. (ECF #12 at PageID 1319). She contends Dr. Rozenfeld's opinion is "based on" Dr. Chuck's opinion and argues "the ALJ cannot accept Dr. Rozenfeld's conclusions while simultaneously rejecting" Dr. Chuck's opinion. (*Id.*). For the following reasons, I find no merit to her argument.

First, Ms. Von Boeselager cites no case law, statute, or regulation supporting her implicit contention that an ALJ must find a consultative examiner's opinion persuasive if a state agency evaluator found it persuasive and the ALJ then found the evaluator's opinion persuasive. Second, although the two opinions suggest deficits in understanding, remembering, and carrying out instructions; maintaining attention, concentration, persistence and pace to perform tasks; and responding appropriately to work pressures, the opinions are quite different from one another. Addressed above, Dr. Chuck determined Ms. Von Boeselager would have an unspecified degree of difficulty in understanding, remembering, and carrying out instructions; maintaining attention,

concentration, persistence, and pace to perform tasks; and responding appropriately to work pressure. Dr. Rozenfeld found persuasive Dr. Chuck's opinion that she would have some difficulty in those areas of mental functioning. (Tr. 81). Then she considered that opinion alongside other medical evidence and determined the record as a whole "indicates the claimant would be somewhat restricted by symptoms but would not be wholly compromised in the ability to function in a work setting." (Tr. 79-81). In other words, her symptoms limit her ability to function, but not to a disabling degree. Dr. Rozenfeld then concluded Ms. Von Boeselager can (1) complete detailed tasks in a work setting without strict production quotas or fast-paced tasks; (2) maintain attention and concentration to complete one- to two-step tasks; and (3) tolerate occasional workplace changes. (Tr. 83-84). So, while the opinions both agree Ms. Von Boeselager has deficits in several areas of mental functioning, Dr. Rozenfeld's opinion provides specific functional restrictions that reflect the degree of her deficits while Dr. Chuck did not. I thus find no inconsistency with the ALJ's medical opinion evaluation.

**III.     The ALJ properly assessed the symptoms and substantial evidence supports the RFC.**

In her final argument, Ms. Von Boeselager contends the ALJ did not adequately evaluate the functional impact of her pain, reduced manual dexterity, fatigue, diminished stress tolerance, impaired concentration, and her ability to sustain the physical and mental demands of light work on a regular and continuing basis and therefore substantial evidence does not support the ALJ's finding that she can perform light work. (ECF #14 at PageID 1320-21). As addressed above, the ALJ's decision to limit Ms. Von Boeselager to frequent handling and fingering and occasional feeling is supported by substantial evidence. For the following reasons, I find no error in the ALJ's assessment of the RFC.

28

The ALJ thoroughly reviewed Ms. Von Boeselager's medical records, taking note of her reported symptoms; physical examinations showing no joint effusions, no synovitis or inflammation in the joints, normal range of motion in the upper and lower extremities, and good muscle strength along with the handful of examinations noting finger deformity and mild tenderness; and mental status examinations showing typically euthymic mood, cooperative, with grossly intact memory, normal attention and concentration, and good judgment and insight. (Tr. 32-34). The ALJ concluded the evidence supports physical and mental functional limitations but not to a disabling degree. (Tr. 34, 35).

Consistent with the two-step process for evaluating a claimant's symptoms described above, the ALJ also considered the statements Ms. Von Boeselager made about her symptoms and determined they are not entirely consistent with the evidence:

> The claimant has alleged disability from difficulty with standing, walking, and climbing stairs. She has difficulty staying in any one position for prolonged periods of time due to pain. She gets migraines three to five days per week lasting between two and six days at a time. She also has chronic all-over-body pain, fatigue, and dizziness. She testified to difficulty doing anything with her hands and wrists. She also has alleged disability from difficulty with brain fog, concentration, and memory. She can pay attention for between three and thirty minutes depending on the task. She has difficulty following spoken instructions. She needs reminders to take care of her personal needs and grooming and to take medication. She does not read as much because she struggles to remember what she read.

> The claimant's allegations of disabling physical functional limitations are not entirely consistent with the evidence of record. Her allegations of difficulty with standing, walking, and climbing are not entirely consistent with the evidence of record. For example, she reported that she can walk for one to one and one-half miles at a time, and she takes her dogs for one or two short walks during the day. Her examinations generally show normal strength, range of motion, muscle tone, and bulk in her lower extremities, and a normal gait. After reviewing the medical evidence of record available, including some of the aforementioned physical examination findings and imaging, the state agency medical consultant opined that the claimant is capable of light exertion with some limitations on climbing and postural activities, which is consistent with the evidence in the record, but not entirely consistent with the

29

claimant's allegations of more disabling limitations in standing, walking, and climbing. Therefore, the allegations of disabling physical functional limitations with regard to walking, standing, and climbing are not entirely consistent with the record. However, the limitations set forth in the residual functional capacity finding adequately account for the limitations (e.g., pain, some loss of sensation, and fatigue) noted in the record.

* * *

The undersigned is cognizant that the degree of limitation that a person might experience from fibromyalgia and other impairments might not necessarily be reflected in a particular treatment note; however, in the instant matter, the longitudinal record does not reflect a significant degree of physical functional limitation from the claimant's physical impairments. Her physical examinations do not reflect the degree and frequency of pain one would expect based on her testimony. The physical examinations findings also do not support loss of strength, range of motion, sensation, reflexes, or coordination that would support a disabling degree of physical limitation. The medical evidence, even with a consideration of limitations from pain, does not support a greater degree of limitation than that which is set forth in the above residual functional capacity assessment.

In sum, the claimant's alleged physical functional limitations are not entirely consistent with the claimant's reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions. Nonetheless, the above evidence supports that the claimant has experienced the degree of limitation reflected in the residual functional capacity assessment above.

The claimant's allegations of disabling mental functional limitations are not entirely consistent with the evidence of record, either. The claimant also has alleged disability from difficulty with brain fog, concentration, and memory. However, she also reported that she can care for pets; she has no difficulty dressing, shaving, feeding herself, or toileting. She can prepare her own meals, do laundry, and do light cleaning. She can drive and go out alone. She can follow written instructions "fine." She volunteers at a local city kennel once per week. She has no problems getting along with family, friends, neighbors, or others, and she has "always gotten along with [authority figures] very well"; she has never been fired or laid off from a job because of problems getting along with other people. She handles stress "pretty well" and she handles changes in routine "very well." She can pay bills, count change, handle a savings account, and use a checkbook or money orders. These reports of daily functioning are not entirely consistent with the allegations of more disabling mental functional limitations. The claimant's examination findings are not entirely consistent with the allegations, either. Although the claimant reported some mental health symptoms at the examinations noted above, her remarkable mental status/psychiatric examination findings are sparse: at a consultative psychological

30

examination in March of 2023, her mood appeared nervous, but she relaxed as the interview progressed; and she wrung her hands constantly. Instead, there are numerous examinations at which the claimant reported no mental health symptoms, including no depression, and her psychiatric/mental status examinations were unremarkable. After reviewing the evidence of record, including some of the above findings, the state agency psychological consultant opined that the claimant remains capable of completing simple and detailed tasks in a work setting without strict production quotas or fast-paced tasks, and she can tolerate occasional workplace changes. This finding is consistent with the evidence of record, but it is not consistent with the claimant's allegations of more disabling mental functional limitations. The undersigned is cognizant of the combined effects that the pain, fatigue, and treatment for the claimant's physical impairments can have on the claimant's mental functioning; however, the residual functional capacity finding adequately accounts for those effects.

In sum, the claimant's alleged mental functional limitations are not entirely consistent with the claimant's reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions. Nonetheless, the above evidence supports that the claimant has experienced the degree of limitation reflected in the residual functional capacity assessment above and the Paragraph B Criteria Analysis discussed above.

(Tr. 36-38). In summary, the ALJ compared Ms. Von Boeselager's testimony and allegations against the case record, including the objective medical evidence, medical source statements, and her reported activities and determined the evidence supports limitations to address her pain, fatigue, and concentration issues, but does not support a finding of disability. The ALJ properly considered Ms. Von Boeselager's statements about her symptoms and found them inconsistent with a finding of disability. That decision and the resulting RFC are supported by substantial evidence.

In support of her argument, Ms. Von Boeselager asserts the medical records show "ongoing difficulties with concentration and persistence caused by fatigue and ADHD." (ECF #14 at PageID 1321). While I agree the medical record shows Ms. Von Boeselager at times reported ongoing difficulties with concentration, the objective medical findings documenting normal attention and concentration contradict her reports. Moreover, as the ALJ noted, Ms. Von Boeselager reported

that atomoxetine helped her feel less scattered and improved her memory and concentration but, despite these benefits, she stopped taking the medication when she stopped working. (Tr. 27). These factors provide a reasonable basis for the ALJ to discount her statements. *Walters,* 127 F.3d at 531 (discounting a claimant's statements to a certain degree is appropriate where the ALJ finds contradictions among the medical reports, testimony, and other evidence); *see also* SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017) ("[I[f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record").

Ms. Von Boeselager also says her impairments cause unpredictable symptoms that require her to take more breaks and cause excessive absences. (ECF #12 at PageID 1321). The ALJ adequately addressed this, explicitly recognizing that limitations associated with Ms. Von Boeselager's fibromyalgia and related impairments "might not be reflected in a particular treatment note," but determined "the longitudinal record does not reflect a significant degree of physical functional limitation from [her] physical impairments," her examinations "do not reflect the degree and frequency of pain one would expect based on her testimony," and the physical findings "do not support loss of strength, range of motion, sensation, reflexes, or coordination that would support a disabling degree of physical limitation." (Tr. 37).

Thus, I find the ALJ properly assessed the medical evidence, medical opinions, and Ms. Von Boeselager's statements about her symptoms, and his conclusions are supported by substantial evidence in the record.

32

CONCLUSION

After review of the record, the parties' arguments, and the law, I **AFFIRM** the

Commissioner's decision denying disability insurance benefits.

Dated: April 9, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

33